**S INDUSTRIES, INC., a Delaware Corporation, Plaintiff,**

v.

**JL AUDIO, INC.; Musicar; Accent Marketing; and Wayne Brown, Defendants.**

No. 96 C 4659.

United States District Court, N.D. Illinois, Eastern Division.

Dec. 9, 1998.

John C. Valas, Chicago, IL, for Plaintiff.

Martin D. Snyder, Hall Adams, III, Williams & Montgomery, Chicago, IL, Dale Paul DiMaggio, Daniel S. Polley, Malin, Haley, DiMaggio & Crosby, Fort Lauderdale, FL, for Defendants.

## MEMORANDUM OPINION AND ORDER

COAR, District Judge.

Before this court are Plaintiff S Industries, Inc.'s ("Plaintiff") and Defendants JL Audio, Inc.'s ("JL"), Musicar's, Accent Marketing's ("Accent"), and Wayne Brown's ("Brown") (collectively, "Defendants") cross-motions for summary judgment as to the remaining four counts of Plaintiff's complaint, which alleges trademark infringement and violation of the Lanham Act § 43, 15 U.S.C. § 1051 *et seq.*, (Counts I–III) and common law unfair competition under the Illinois Consumer Fraud and Deceptive Business/Trade Practices Act, 815 ILCS 505/1 *et seq.*, (Count IV). Count V (counterfeit trademark) has previously been dismissed by Plaintiff. Also before this court is Plaintiff's motion for judicial notice and Defendants' motion to strike. For the following reasons, Defendants' motion for summary judgment is GRANTED as to all remaining counts and Plaintiff's motion for summary judgment is DENIED. Plaintiff's motion for judicial notice is GRANTED in part, DENIED in part, and MOOT in part. Defendants' motion to strike is MOOT.

### I. Preface

This has not been a good year for Plaintiff in the Northern District of Illinois, but, then again, Plaintiff has not been a good litigant. This is one of several trademark infringement cases brought by Plaintiff S Industries against various defendants who make a wide range of products. Essentially, if an entity markets a product with some version of the name "Stealth" or otherwise with a "stealth"-like description, Plaintiff has elected to sue that entity. Yet, time and time again, Plaintiff's claims are rebuffed, with judges in this district having granted summary judgment against Plaintiff in four different cases in the year of 1998. *S Industries, Inc. v. Stone Age Equipment, Inc.,* 12 F.Supp.2d 796, 1998 U.S. Dist. LEXIS 9562 (N.D.Ill.1998) (Castillo, J.); *S Industries, Inc. v. Centra 2000, Inc.,* 1998 WL 157067, 1998 U.S. Dist. LEXIS 4682 (N.D.Ill.1998) (Lindberg, J.); *S Industries, Inc. v. GMI Holdings, Inc.,* 1998 WL 67627, 1998 U.S. Dist. LEXIS 1780 (N.D.Ill.1998) (Kocoras, J.); *S Industries, Inc. v. Diamond Multimedia Systems, Inc.,* 991 F.Supp. 1012, 1998 U.S. Dist. LEXIS 596 (N.D.Ill.1998) (Andersen, J.). *See also S Industries, Inc. v. World of Weapons,* 1997 WL 17796, 1996 U.S. Dist. LEXIS 18245 (N.D.Ill. 1996) (granting a defendant's motion to dismiss on personal jurisdiction grounds) (Kocoras, J.), *motion to vacate denied,* 1997 WL 17796, 1997 U.S. LEXIS 643 (N.D.Ill.1997). As Judge Shadur aptly noted in 1996, Plaintiff "appears to have entered into a new industry—that of instituting federal litigation." *S Industries, Inc. v. Hobbico, Inc.,* 940 F.Supp. 210, 211 (N.D.Ill.1996).

Much about this case is troubling. Plaintiff's actions in this case and in the several other cases filed throughout this district raise doubts as to the good faith of Plaintiff and its counsel. Additionally, both parties in this case have, at times, acted contrary to the spirit and, in some ways, the letter of the Local Rules and this court's standing orders. Both Plaintiff and Defendants sought to evade the 15–page limit for memoranda by compressing the line-spacing of their memoranda. (*Compare* Ptf's Mem. in Support of Summary Judgment *and* Dfts' Mem. in Support of Summary Judgment (approximately 1.5 line spacing) *with* Dft's Mem. in Support of Motion to Strike (double-spacing).) Plaintiff and Defendants used this compressed line-spacing to give themselves the equivalent of an extra brief apiece between the two cross-motions. Additionally, Plaintiff reduced the type size of its footnotes to attain even more extra space. This behavior is unacceptable and will not be tolerated in the future. The parties are expected to use double-spacing for the body text, to utilize 12–point font for all text in the opinion, and to use one inch margins. If (as was not the case with any of the memoranda thus far

submitted), more space is necessary to offer a thorough argument, the party seeking additional pages beyond the 15–page limit may come in on a motion to submit a longer brief. Unless this court grants such a motion, the parties shall limit to themselves to the 15–page limit as set forth in the ·Local Rules, this opinion, and this court's standing orders.

In addition to its attempt to make an end run around the 15–page limit, Plaintiff also attempted to use its 12(N) Response [1] as a section of additional legal argument. Plaintiff's counsel has sufficient experience in this district to realize that Local Rule 12(N) states that the respondent to a summary judgment motion should include "a concise response to the movant's statement that shall contain: (a) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon...." Local Rule 12(N)(3)(a). Including as much as 2 pages of legal argument (with 1.5 spacing) in a "response" to a single paragraph of the Defendants' 12(M) Statement does not constitute "a concise response." Legal argument is for the Responsive Memorandum—not for the 12(N)(3)(a) Response. Local Rule 12(N)(2). The court will consider Plaintiff's 12(N)(3)(a) to the extent that it follows this rule but will not consider any legal argument contained in it. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir.1994) (stating that the Seventh Circuit upholds "the strict enforcement" of Local Rules regulating summary judgment motions).

## II. Facts

Plaintiff is a Delaware corporation with its principal place of business in Chicago, Illinois. (Dfts' 12(M) Stmt. ¶ 59.) JL Audio, Inc., is a Florida corporation that manufactures and markets audio equipment and sells such products throughout the United States, including within the Northern District of Illinois. (Dfts' 12(M) Stmt. ¶ 60.) Defendants Accent Marketing, Musicar, and Wayne Brown sell products and/or do business within the Northern District of Illinois. (Dfts' 12(M) Stmt. ¶ 61.)

Defendant JL Audio manufactures and markets high-end, custom designed speaker boxes and enclosures under the mark "STEALTHBOX." (Dfts' 12(M) Stmt. ¶ 1.) [2] JL Audio's housemarks "JL Audio" and/or "JL Audio and Logo Design" also appear on the Stealthboxes sold under the mark "STEALTHBOX," as well as marketing materials used for such products. (Dfts' 12(M) Stmt. ¶ 2.) [3] JL Audio's housemarks "JL Audio" and/or "JL Audio and Logo Design" are used in conjunction with the secondary mark "STEALTHBOX" for JL Audio's Stealthboxes. (Dfts' 12(M) Stmt. ¶ 3.) JL Audio is the owner of two federally registered trademarks: U.S. Trademark Registration No. 1,948,910 (the "910 Registration"), which is for use of the mark "JL

---

**1.** · In order to keep the various factual statements clear in this opinion, the court will refer to the Statement of Facts in Plaintiff's summary judgment motion as Plaintiff's 12(M) Statement and Defendants' 12(N) Response and to the Statement of·Facts in Defendant's summary judgment motion as Defendants' 12(M) Statement and Plaintiff's 12(N) Response.

**2.** Plaintiff disputes this claim on the grounds that Defendants failed to produce any evidence which would support Defendants' assertion (presumably, only the part of the assertion that claims that the speaker boxes ("Stealthboxes") are "high-end [and] custom designed)," for Plaintiff has admitted the rest of the sentence. The court disagrees with Plaintiff's challenge. The materials attached to Plaintiff's own complaint and referenced by Defendants in paragraph 1 support this claim, as they list the different versions of Stealthboxes available—all of which are custom designed depending on the make, model, and, in

some cases, the year of the buyer's automobile. (Ptf's Cplt. Ex. C.) Additionally, Plaintiff has included materials showing that JL Audio's Speakerboxes sell for over $500. (Ptf's Ex. F to Motion for Judicial Notice.)

**3.** Plaintiff challenges this claim on the ground that Defendants produced no samples of the Stealthboxes. However, two exhibits offered by Plaintiff distinctly show JL Audio's housemarks on marketing materials and on the pictured Stealthboxes. (Ptf's Cplt. Ex. C; Ptf's Ex. F to Motion for Judicial Request.) Plaintiff's "but see" citation to its Ex. F to Motion for Judicial Request is particularly mystifying. The housemark and logo for JL Audio appear 7 times on the page advertising the Stealthboxes—once on the top of the page, once (in large type including the JL Audio logo) above the description of the Stealthboxes (which are described as "custom stealth subs and enclosures"), and on five of the speakers pictured.

AUDIO" on Audio and stereo components and accessories, particularly speakers and U.S. Trademark Registration No. 1,956,624 (the "624 Registration"), which is for the use of the mark "JL AUDIO & DESIGN" on stereo components and accessories, namely amplifiers, receivers, tuners, equalizers, and loudspeakers. (Dfts' 12(M) Stmt. ¶ 10.)

Plaintiff cites to four United States Trademark Registrations in its Complaint: U.S. Trademark Registration No. 1,332,378 (the "378 Registration"), which is for use of the mark "STEALTH" on sporting goods, specifically, tennis rackets, golf clubs, tennis balls, basketballs, baseballs, soccerballs, golf balls, crossbows, tennis racquet strings, and shuttlecocks in International Class 28, (Dfts' 12(M) Stmt. ¶ 4); U.S. Trademark Registration No. 1,434,642 (the "642 Registration"), which is for use of the mark "STEALTH" on bicycles, motorcycles, and boats in International Class 12, (Dfts' 12(M) Stmt. ¶ 5); U.S. Trademark Registration No. 1,867,087 (the "087 Registration"), which is for use of the mark "STEALTH and Design" on pool cues, pool tables, darts, billiard balls, cue cases, cue racks, and billiard gloves, in International Class 28, (Dfts' 12(M) Stmt. ¶ 6); U.S. Trademark Registration No. 1,717,010 (the "010 Registration"), which is for use of the mark "STEALTH" on microwave absorbing automobile paint, in International Class 2. (Dfts' 12(M) Stmt. ¶ 7.) Since July 29, 1996 (the date that Plaintiff's Complaint was filed), Plaintiff has attained four more federal registrations for the mark STEALTH: U.S. Trademark Registration No. 2,007,348 (the "348 Registration"), which is for use of the mark "STEALTH SQUAD" on comic books, in International Class 16 (Ptf's Ex. A to Ptf's Motion for Judicial Notice); U.S. Trademark Registration No. 2,024,889 (the "889 Registration"), which is for the use of the mark "STEALTH" on lawn sprinklers, in International Class 21 (Ptf's Ex. A to Ptf's Motion for Judicial Notice); U.S. Trademark Registration No. 2,025,156 (the "156 Registration"), which is for the use of the mark "STEALTH" on metal alloys for use in sporting goods and transportation and window locks, in International Class 6 (Ptf's Ex. A to Ptf's Motion for Judicial Notice); U.S. Trademark Registration No. 1,766,806 (the "806 Registration"), which is for the use of the mark "STEALTH" on fishing tackle floats, in International Class 28 (Ptf's Ex. B to Ptf's Motion for Judicial Notice). Additionally, Cobra Electronics has assigned to Plaintiff, effective on September 1, 1998, its STEALTH federal trademark Registration No. 2,074,780, issued on July 1, 1997, for radar detectors in International Class 9. (Ptf's 12(N) Resp. ¶ 8.) [4]

JL Audio has filed a U.S. trademark application for the mark "STEALTHBOX"; its trademark has been allowed by the U.S. Patent and Trademark Office ("PTO"), and has been passed to publication. (Dfts' 12(M) Stmt. ¶¶ 11–12.) Plaintiff's Letter of Protest against JL Audio's trademark application was denied by the PTO on December 17, 1997 on the grounds that the PTO's determination of no likelihood of confusion was not clearly erroneous "[i]n view of the differences between [JL Audio's] mark and goods and [Plaintiff's] mark and goods...." (Dft's Reply Mem. Ex. E (PTO letter).) Plaintiff has filed a Notice of Opposition to JL Audio's application. (Ptf's 12(N) Resp. ¶ 13.) Plaintiff has also filed a U.S. trademark application for the mark STEALTH used on "radios and speakers for automobiles, stereo speaker boxes, tape recorders, tape players and portable stereos," and notes that the PTO found a likelihood of confusion between this application for use of the STEALTH mark as to radios and speakers, etc., and JL Audio's putative "Stealthbox" trademark. (Ptf's 12(N) Resp. ¶ 13.)

JL Audio's Stealthboxes are high-end customized products which are relatively expensive with respect to general audio equipment. (Dfts' 12(M) Stmt. ¶ 14.) JL Audio's speaker boxes and enclosures have ranged in price from $500.00 to $2000.00. (Dfts' 12(M) Stmt. ¶ 15.) Each particular speaker box or enclosure is designed to fit into a particular make

**4.** Plaintiff cites to a registration that Plaintiff has for the mark "DARK STAR" registered on April 29, 1997 for the goods of audiocassettes, audio tapes, and radios. (Ptf's 12(M) Stmt. ¶¶ 5–6.) This registration is not relevant to the issue of whether Plaintiff has been marketing audio equipment that is closely related to Defendants' stereo boxes and enclosures AND that is marketed with the mark of STEALTH.

and year of a specific vehicle. (Dfts' 12(M) Stmt. ¶ 16.) JL Audio's products do not merely reside on shelves in mass merchant stores. (Dfts' 12(M) Stmt. ¶ 17.) JL Audio advertises its products in or have had its products reviewed in auto sound industry magazines, such as Car Audio and Electronics magazine, Car Sound magazine, and Today's Truck and Sport Utility Vehicle. (Dfts' 12(M) Stmt. ¶ 18.) Plaintiff does not advertise in any publications in which JL Audio advertises its products. (Dfts' 12(M) Stmt. ¶ 19.) JL Audio does not sell product to or through mass merchant stores allegedly targeted by Plaintiff. (Dfts' 12(M) Stmt. ¶ 20.) JL Audio sells its speaker boxes and enclosures under the mark "STEALTHBOX" directly to auto sound specialty retail stores who are set up as authorized JL Audio dealers. (Dfts' 12(M) Stmt. ¶ 21.)[5] JL Audio also advertises its products, including speaker boxes and enclosures sold under the mark "STEALTHBOX" at its website, which has an address of www.jlaudio.com. (Dfts' 12(M) Stmt. ¶ 22.) Plaintiff has never attended a trade show at which JL Audio has also been present. (Dfts' 12(M) Stmt. ¶ 23.) JL Audio's products are high-end audio products geared toward sophisticated audio purchasers who are discerning individuals who take great care and pride in their audio components and who do not purchase audio products on impulse. (Dfts' 12(M) Stmt. ¶ 26.) JL Audio's advertisements describe its Stealthboxes as "a custom engineered subwoofer system from JL Audio that bolts into place, disappears in your vehicle and produces uncommonly satisfying sub-bass performance." (Ptf's 12(M) Stmt. ¶ 38.)

JL Audio is unaware of any actual confusion by consumers between the parties' goods. (Dfts' 12(M) Stmt. ¶ 30.) Plaintiff possesses no documents which evidence any actual confusion by consumers between the parties' goods. (Dfts' 12(M) Stmt. ¶ 31.) The only evidence that Plaintiff has offered to demonstrate actual confusion is the testimony of Christopher Stoller ("C.Stoller"), that unnamed customers of JL Audio allegedly contacted STR Industries, a licensee of S. Industries, to complain about JL Audio's Stealthboxes. (Ptf's 12(N) Resp. ¶¶ 30–31.)

Prior to the adoption of the "STEALTHBOX" mark for its speaker boxes and enclosures, JL Audio had never heard of Leo Stoller ("L.Stoller"), Plaintiff, Stealth Industries, Inc., Chestnut Industries, Inc., or Sentra Industries, Inc., or of any alleged use by these entities of the mark "STEALTH" for any products, including audio products. (Dfts' 12(M) Stmt. ¶ 34.)[6] JL Audio's selection of "STEALTHBOX" for its speaker boxes and enclosures evolved from its previous use of the mark "SMARTBOX" for similar products installed in trucks. (Dfts' 12(M) Stmt. ¶ 35.) Plaintiff's alleged mark "STEALTH" was never taken into consideration with respect to the selection of "STEALTHBOX" by JL Audio. (Dfts' 12(M) Stmt. ¶ 36.)

Plaintiff produced no receipts, invoices, or sales orders evidencing any sales of any product by Plaintiff during the 1990s. (Dfts' 12(M) Stmt. ¶ 37.) Specifically, Plaintiff produced no receipts, invoices, or sales orders evidencing any sales of any STEALTH audio or stereo equipment by Plaintiff during the 1990s. (Dfts' 12(M) Stmt. ¶ 38.) Plaintiff

---

5. Plaintiff has requested that this court take judicial notice of an advertisement in an electronic catalog in which JL Audio's goods were advertised as "custom stealth subs and enclosures." (Motion for Judicial Notice ¶ 6 and Ex. F.) However, Plaintiff has failed to include significant facts relating to the catalog, e.g., facts about the producer of the catalog, facts supporting the authenticity of the catalog, etc. Additionally, in view of Plaintiff's admission that "stealth" may be descriptive of JL Audio's Stealthboxes and in view of the fact that JL Audio's housemark appears 7 times on the catalog page and its secondary mark "Stealth Box" appears twice on the catalog page, the electronics catalog does not demonstrate what Plaintiff apparently wishes to

use it for, i.e., that JL Audio has advertised its goods simply as "STEALTH" speakers as a mark without the accompaniment of "JL Audio" or of the entire secondary mark of "Stealthbox."

6. Plaintiff's claim that "JL Audio has not present [sic] any evidence supporting this naked assertion" is incorrect. (Ptf's 12(N) Resp. ¶ 34.) Defendants cited to the affidavit of Manville D. Smith ("Smith Affidavit"). Plaintiff has not offered any reason to challenge Mr. Smith's competency to testify regarding JL Audio's knowledge prior to the adoption of the mark "STEALTHBOX," and, thus, his unrebutted testimony is admissible.

produced no documentation evidencing any shipment of products, STEALTH products, or STEALTH audio or stereo products by Plaintiff during the 1990s. (Dfts' 12(M) Stmt. ¶¶ 39–41.) Plaintiff did produce two invoices, one from 1986 and one from 1987, for sales of a total of 18 STEALTH car speaker or radio products: 10 "STEALTH SENTRA car speaker boxes" and 6 "STEALTH TERMINATOR car radios" ($20 apiece for $320.00 total with no provision for sales taxes or shipping and handling) in 1986 and 2 "STEALTH car radios" ($40 apiece for $80.00 total with no provision for sales taxes or shipping or handling) in 1987. (Ptf's 12(M) Stmt. ¶¶ 7–10; Ptf's Ex. C1 and C2 (invoices).) [7]

Leo Stoller ("L.Stoller") is the sole employee, shareholder, officer, or director of Plaintiff. (Dfts' 12(M) Stmt. ¶ 55.) He is the most knowledgeable representative of Plaintiff. (Dfts' 12(M) Stmt. ¶ 42.) In his deposition, L. Stoller testified that he has never performed any formal market analysis or surveys regarding who his competitors were and how they affected his sales. (Dfts' 12(M) Stmt. ¶ 43.) [8] L. Stoller also admitted that he was not aware of any instances in which JL Audio was using marketing or sales literature that he created. (Dfts' 12(M) Stmt. ¶ 45.) L. Stoller admitted that he was not aware of any instances in which JL Audio's Stealthboxes were sold in the same stores as his alleged audio products. (Dfts' 12(M) Stmt. ¶ 46.) L. Stoller admitted that he was not aware of any publications in which he and JL Audio both advertised their products. (Dfts' 12(M) Stmt. ¶ 47.) L. Stoller testified that he was not aware of any trade shows at which both he and JL Audio had exhibited audio products bearing some derivatives of the mark "STEALTH." (Dfts' 12(M) Stmt. ¶ 48.)

In Plaintiff's application for Certificate of Authority to Transact Business in Illinois dated February 17, 1994, Plaintiff indicated that it estimated its total business to be transacted by it everywhere for the following year to be One Dollars. (Dfts' 12(M) Stmt. ¶ 49.) HHA Sports is no longer manufacturing, marketing, or selling any products under the mark STEALTH. (Dfts' 12(M) Stmt. ¶ 50.) Wonderwand, Inc., is no longer manufacturing or marketing any products under the mark STEALTH. (Dfts' 12(M) Stmt. ¶ 51.) Plaintiff has produced no documentary evidence (e.g., invoices, etc.) showing sales of any "STEALTH" audio products during the 1990s. (Dfts' 12(M) Stmt. ¶ 52.) To attempt to show trademark use, Plaintiff produced only alleged catalog sheets of audio products it allegedly mass mailed, unsolicited with a cover letter, to various buyers throughout the country. (Dfts' 12(M) Stmt. ¶ 53.) Stoller testified that he merely works out of a home office. (Dfts' 12(M) Stmt. ¶ 54.) Other than Stoller, Plaintiff has no other employees, shareholders, officers, or directors. (Dfts' 12(M) Stmt. ¶ 55.) Plaintiff

---

7. Defendants challenge the authenticity of these two invoices on the grounds that they include no provision for sales tax or shipping and handling. (Dfts' 12(N) Resp. ¶¶ 7–10.) The court finds that the invoices are admissible because L. Stoller has attested that they are true and correct copies of real Stealth Industries, Inc. invoices. (L. Stoller Decl. ¶¶ 29–30.) As discussed later in this opinion, these few sales, which occurred years before the alleged infringement, do not serve to provide actual trademark use in the area of car audio components.

8. Plaintiff's "disputes" to Defendants' 12(M) Statements regarding L. Stoller's deposition are frequently ephemeral. For example, Plaintiff disputes Dfts' 12(M) Stmt. ¶ 43 ("During the course of his discovery deposition, Leo Stoller testified that he has never performed any formal market analysis or surveys regarding who his competitors were and how they affected his sales.") on the grounds that Leo Stoller had testified that Plaintiff "conducts and market analysis as and [sic] ongoing part of its busi-

ness." (Ptf's 12(N) Resp. ¶ 43.) This is not a legitimate dispute. L. Stoller testified as follows:

A. Been self-employed all my adult life, and I have not per se conducted any kind of expensive survey because all I have to do is go into any retailer, see what brands they're carrying, go to any consumer electronics trade show and see what brands are being sold out. And I can figure it out in ten minutes, counselor.
 No, I did not conduct any survey. I don't have to conduct any surveys.
Q. So the answer to the question is no?
A. Right. I do it intuitively. The surveys that I conduct are intuitive surveys based on going into Circuit City, going into Best Buy, going into the retailers and seeing what radios are being sold in those stores. And those are my competitors.
 So, in essence, I am conducting surveys all the time, and I don't contract out to have an expensive survey done by any firm.
(Dfts' Ex. J (L. Stoller Dep.) at 282–83.)

does not have any accounting records for the 1990s. (Dfts' 12(M) Stmt. ¶ 56.) The one document that Plaintiff has produced is a "Five Year Sales Report for STEALTH, SENTRA, and TERMINATOR Auto Products," which L. Stoller prepared himself from numbers that he had "maintained for compilation of the total gross sales of these audio figures, the sales figures." (Ptf's Ex. A to 12(N) Resp. (Stoller Dep.) at 106–07.) L. Stoller admits that he did not consult invoices to make the document and states that at some point in time he had consulted invoices from 1990 and 1992–93 to create the sales figures for those three years that he ultimately relied upon to create the document. (Ptf's Ex. A to 12(N) Resp. (Stoller Dep.) at 107–110.) The Five Year Sales Report lists sales reports for three different types of audio equipment (STEALTH, SENTRA, and TERMINATOR Audio Products) and states (without differentiation between the different products) that Plaintiff sold $2498 in audio products in 1990, $2674 in 1992, $2782 in 1993, $2864 in 1994, $2959 for 1996, and $2908 in 1996. (Ptf's 12(M) Stmt. ¶¶ 11–12.)[9] C. Stoller testified that STR sold STEALTH brand speakers and radios to national stores including "Howard's" and "Kmart." (Ptf's 12(M) Stmt. ¶ 48.) No tax returns have been filed for Plaintiff for at least the past three years. (Dfts' 12(M) Stmt. ¶ 57.)

Plaintiff has produced advertising, routing guides, and purchasing information sheets for STEALTH audio equipment dated in the 1980s. (Ptf's 12(M) Stmt. ¶¶ 13, 15–18.) Plaintiff has also produced a licensing agreement between itself (signed by L. Stoller on behalf of Plaintiff) and related corporation Stealth Industries, Inc. (signed by L. Stoller on behalf of Stealth Industries, Inc.) purportedly licensing the mark STEALTH for use on products, including "audio stereo speaker boxes, car radios . . . ." (Ptf's 12(M) Stmt.

¶ 31; Ptf. Ex. CL5 (Stealth license).) Plaintiff has produced a licensing agreement between itself (signed by L. Stoller on behalf of Plaintiff) and related corporation Sentra Industries, Inc. (signed by L. Stoller on behalf of Sentra Industries, Inc.) purportedly licensing the mark STEALTH for use on products, including "automobile lights, paint, audio stereo speaker boxes, car radios . . . ." (Ptf's 12(M) Stmt. ¶ 33; Ptf. Ex. CL2 (Sentra license).)

## III. Summary judgment standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Cox v. Acme Health Serv., Inc.*, 55 F.3d 1304, 1308 (7th Cir.1995). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995). The movant has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995). If the movant meets this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in

9. The court doubts that this Sales Report is admissible. It is hearsay and relies on hearsay statements, and Plaintiff has not shown that it falls within any of the hearsay exceptions. In particular, L. Stoller, who produced the Sales Report, was unable to describe how he prepared them or to demonstrate that the numbers at issue were kept in the ordinary course of business. L. Stoller testified that he basically looked through what materials he had and put what figures he

had into the report. Thus, for 1991, he included no figures in the Sales Report because he could not find any figures for that year. He could not identify when the Sales Report was produced and testified that the basic records on which the figures were allegedly based were erased. (Ptf's Ex. A (L. Stoller Dep.) at 107–15.) Thus, the Sales Report does not include the indicia of trustworthiness traditionally required for admissibility of a hearsay statement.

which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552–53. A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

On cross-motions for summary judgment, each movant must individually satisfy the requirements of Rule 56. *Proviso Association of Retarded Citizens v. Village of Westchester*, 914 F.Supp. 1555, 1560 (N.D.Ill. 1996); *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Ind.) Pension Fund v. Kelly*, 1996 WL 507258, *3 (N.D.Ill. 1996). Thus, the traditional standards for summary judgment still apply even though both parties have moved for summary judgment. *Blum v. Fisher and Fisher, Attorneys at Law*, 961 F.Supp. 1218, 1222 (N.D.Ill. 1997). The Court thus considers the merits of each cross-motion separately and draws all reasonable inferences and resolves all factual uncertainties against the party whose motion is under consideration. *Chicago Truck Drivers*, 1996 WL 507258 at *3. This "Janus-like perspective ... sometimes forces the denial of both motions," but only where there are material facts in dispute. *Buttitta v. City of Chicago*, 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd*, 9 F.3d 1198 (7th Cir.1993).

## IV. Analysis

### A. Federal claims

"In a trademark infringement claim, the plaintiff must demonstrate: (1) the validity of its trademark; and (2) the infringement of that mark." *Platinum Home Mortgage Corporation v. Platinum Financial Group, Inc.*, 149 F.3d 722, 726 (7th Cir.1998). The court will now consider each of these two elements in turn.

#### 1. Validity of Plaintiff's trademark

■ Registration of a trademark "is admissible into evidence to establish registrant's rights on a prima facie basis but ... an opposing party may prove any legal or equitable defense or defect which might have been asserted if the mark had not been registered." *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 378 (7th Cir.1976).

Defendant challenges the validity of Plaintiff's mark on the parallel grounds that Plaintiff is not using the "STEALTH" mark as part of an established, ongoing business or that Plaintiff has abandoned the mark, at least as to audio equipment. For Plaintiff to have "ownership rights" in the mark "STEALTH," Plaintiff "must show that it actually uses the mark[ ] in connection with an established, presently existing, and ongoing business." *MCV, Inc. v. King–Seeley Thermos Co.*, 1988 WL 10687, *2 (N.D.Ill. 1988). *See also Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir.1992) (" 'Use' is neither a glitch in the Lanham Act nor a historical relic. By insisting that firms use marks to obtain rights in them, the law prevents entrepreneurs from reserving brand names in order to make their rivals' marketing more costly. Public sales let others know that they should not invest resources to develop a mark similar to one already used in the trade. Only active use allows consumers to associate a mark with particular goods and notifies other firms that the mark is so associated."). Defendants point to the minimal amount of proceeds alleged by Plaintiff on Plaintiff's application to transact business in Illinois ($1.00 predicted revenues in 1994), the lack of any tax returns over the last three years, and the lack of non-testimonial evidence (e.g., samples of products or invoices and receipts) evidencing conduct of business. *See Heinemann v. General Motors Corp.*, 342 F.Supp. 203, 173 U.S.P.Q. 214 (N.D.Ill.1972) ("The amount of compensation received ... is so minimal that this Court is convinced that, as a matter of law, plaintiff was not engaged in the business of racing."). Plaintiff offers a plethora of advertising materials allegedly sent to wholesale buyers; however "mere advertising and documentary use of a notation apart from the goods do not constitute technical trademark use." *Powermatics, Inc. v. Globe Roofing Products Co.*, 341 F.2d 127, 130, 52 C.C.P.A. 950, 954 (1965). *See also Avakoff v. Southern Pacific Co.*, 765 F.2d 1097, 1098 (Fed.Cir.1985) (same); *The Boss Co. v. Homemaker Rugs*, 117 U.S.P.Q. 255 (N.D.Ill.1958) (stating that evidence of advertising and of invoices is insufficient to establish trademark rights). Other testimonial evidence, Plaintiff has

shown no actual admissible evidence of "STEALTH" items in the 1990s. The one piece of physical evidence of sales—an inadmissible table of Plaintiff's gross sales of audio goods—does not differentiate between STEALTH audio goods and SENTRA or TERMINATOR audio goods. The evidence in support of sales of STEALTH audio goods in the 1980s—two invoices from 1986 and 1987 covering a total of 18 STEALTH car speaker or radio products. As a matter of law, such evidence is not sufficient to establish use. *See Zazu Designs,* 979 F.2d at 503 ("ZHD's sales of its product are insufficient use to establish priority over L'Oreal. A few bottles sold over the counter in Hinsdale, and few more mailed to friends in Texas and Florida, neither link the ZAZU mark with ZHD's product in the minds of customers nor put other producers on notice. As a practical matter ZHD had no product, period, until months after L'Oreal had embarked on its doomed campaign.").[10] At a minimum, Plaintiff has failed to establish, as a matter of law, that it has conducted sufficient use of any kind but particularly use as to audio products to justify the validity of its trademark. Thus, Plaintiff's motion for summary judgment must be DENIED. Plaintiff's failure to put forth admissible evidence to establish sufficient use also requires this court to GRANT Defendants' motion for summary judgment.[11] *See S Indus. v. GMI Holdings,* 1998 WL 67627, *5, 1998 U.S. Dist. LEXIS 1780 at *15 (holding that Plaintiff had failed in that case to demonstrate trademark use as to lawn sprinklers and paint; assuming for

purposes of summary judgment motion only that Plaintiff had established use as to garage door locks and window locks); *S. Indus. v. Diamond,* 991 F.Supp. 1012, 1020, 1998 U.S. Dist. LEXIS 596 at *23 (holding that Plaintiff had failed to establish use as to computers and related goods).

### 2. Infringement of Plaintiff's trademark

Even if the court found that Plaintiff had established validity of its trademark, the court finds that summary judgment in favor of Defendants is appropriate on the issue of infringement. "Likelihood of confusion is a question of fact in this circuit, but like any fact can be determined at the summary judgment stage if not contestable." *Door Systems, Inc. v. Pro–Line Door Systems, Inc.,* 83 F.3d 169, 173 (7th Cir.1996).

"The 'keystone' of trademark infringement is 'likelihood of confusion' as to source, affiliation, connection or sponsorship of goods or services among the relevant class of customers and potential customers." *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 957 (7th Cir.1992), *cert. denied,* 507 U.S. 1042, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993). A trademark holder may offer two different theories of confusion. The typical theory, and the one largely advanced by Plaintiff, is "forward" confusion, "which occurs 'when customers mistakenly think that the junior user's goods or services are from the same source as or are connected with the senior user's goods or services.'" *Id.*

**10.** A large fraction of Plaintiff's overly long argumentation is devoted to attacking *Zazu Designs* and the cases that follow it. The court does not concur with Plaintiff's analysis of *Zazu Designs.* Specifically, the Seventh Circuit did not foreclose summary judgment in a case, like this one, where the admissible evidence brought before the court shows minimal or no sales; rather, it justified its decision not to defer to the finder of fact on the issue of use because "the extent to which ZHD used the mark is not disputed" and went on to find that *as a matter of law* the amount of use was insufficient to establish a valid trademark. 979 F.2d at 505. Thus, contrary to Plaintiff's claims, where the amount of use is not genuinely in dispute, summary judgment is appropriate. Here, the court finds that Plaintiff, who has the burden of proof to show trademark validity, *Rust Environment & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1214

(7th Cir.1997), has not proffered admissible evidence showing actual sales in the 1990s and has only shown minimal sales that occurred almost a decade before this case was filed. Thus, the amount of use is not genuinely in dispute.

**11.** The court's finding that Plaintiff has failed to establish use makes a finding of abandonment unnecessary, as abandonment occurs when a mark (1) was in use and (2) is no longer in use and there is no intent to resume its use, such that two consecutive years of nonuse is "prima facie evidence of abandonment." *Rust Environment & Infrastructure,* 131 F.3d at 1214 (quoting 15 U.S.C. § 1127). The court notes that, if Plaintiff's proffered invoice evidence from 1986 and 1987 was sufficient to demonstrate use, that Plaintiff's failure to proffer admissible evidence of use in the 1990s would support a finding of abandonment.

(quoting 2 McCarthy, *Trademarks and Unfair Competition*, § 23:1, at 42–43, 46–47). Thus, under the theory of "forward" confusion, Plaintiff argues that it is the senior user and holder of a "famous" mark and that Defendants, by copying that mark, are confusing customers into thinking that Defendants' goods actually are produced and distributed by Plaintiff. The second theory, briefly alluded to by Plaintiff in its Responsive Memorandum to Defendants' motion for summary judgment, is "reverse" confusion, which "occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user," thus taking some of the value of the mark from the senior user and possibly foreclosing the senior user's expansion into new markets or even causing consumers to believe that the senior user is the infringer. *Id.* Beyond the fact that Plaintiff has never clearly stated a reverse confusion claim, Plaintiff has proffered neither argument nor evidence to show that any reverse confusion has or is likely to occur. Indeed, Plaintiff's argument relies on its assertion that its "STEALTH" mark is famous and strongly associated with Plaintiff and that consumers are likely to think that JL Audio's goods are manufactured by Plaintiff.[12] Accordingly, this court shall analyze Plaintiff's claims under the forward confusion theory.

 There are seven factors in a likelihood of confusion analysis: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and (7) intent of defendant 'to palm-off his product as that of another.'" *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 615 (7th Cir.1993) (quoting *Forum Corp. of North Am. v. Forum Ltd.*, 903 F.2d 434, 439 (7th Cir.1990)). None of these factors are determinative and, indeed, the likelihood of confusion determination does not require a party to prove its arguments on all or even the majority of the factors. *Id.* at 616. Rather, the court must determine on a case by case basis which factors should be given more weight in the likelihood of confusion analysis. With that in mind, the court will now consider the each of the seven factors.

### a. Similarity of marks

 In determining whether the two marks are similar, "the proper method of comparison is conducted 'in light of what occurs in the marketplace, not in the courtroom.'" *Forum Corp.*, 903 F.2d at 439 (citation omitted). "Any memorable feature of a mark, which of course includes the way it sounds, should be considered in analyzing likelihood of confusion." *Id.* at 440. *See also Nike Inc. v. "Just Did It" Enterprises*, 6 F.3d 1225, 1230 (7th Cir.1993) (citing with approval *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 116 (2d Cir. 1984)). In this case, we have two marks: Plaintiff's STEALTH mark and JL Audio's STEALTHBOX mark. Looked at in a vacuum, one might consider the two marks to be similar, as the dominant part of each mark is the term "STEALTH." *See Forum Corp.*, 903 F.2d at 440 (focusing on the "dominant" or "salient" part of the mark). Looking at the marks as the consumer would see them, however, shows one significant difference between the two marks: Plaintiff's STEALTH mark is a primary mark, used without any other mark, while JL Audio's STEALTHBOX mark is a secondary mark, always used in conjunction with JL Audio's name and/or logo. "The use of a brand name, particularly a well known one ... is likely to reduce the likelihood of confusion as to the source of the product." *Breuer Electric Mfg. Co. v. The Hoover Co.*, 1998 WL 427595, *6 (N.D.Ill. 1998). *See also, Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 355 (7th Cir.1983) (noting that "a prominent housemark may tend to lessen confusion"); *Munters Corp. v. Matsui America, Inc.*, 730 F.Supp. 790, 795 (N.D.Ill.1989) (" 'Prominent display of different names on the marks ... reduce[s] the likelihood of confusion even where ... the marks are otherwise simi-

---

**12.** In the end, the court applies the same likelihood of confusion test in a reverse confusion case as it does in a forward confusion case, *see Sands, Taylor & Wood*, 978 F.2d at 959, and would find that many of the reasons that defeat Plaintiff's forward confusion claim also apply to any reverse confusion claim and, thus, that a reverse confusion claim would also fail.

lar.'"; quoting *Ziebart Int'l Corp. v. After Market Assocs.*, 802 F.2d 220, 226 (7th Cir. 1986)), *aff'd*, 909 F.2d 250 (7th Cir.1990); *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 969 (2d Cir.1981) ("When similar marks are always presented in association with company names, the likelihood of confusion is reduced.").[13]

Additionally, Plaintiff actually urges against finding that consumers would view the marks as similar and as source identifying. Plaintiff argues (in multiple places) that "stealth" in the context of JL Audio's stereo boxes is actually a descriptive mark, and, thus, undeserving of trademark protection.[14] However, a court should give *less* weight to a descriptive term in considering whether marks are similar and whether a given mark is source identifying. *See Henri's Food Products Co. v. Kraft, Inc.*, 717 F.2d at 356 ("When one portion of a composite mark is a descriptive or generic word, that feature of the mark may be of less significance in designating a source of origin."; finding that finding that common term in two marks was descriptive and, thus, that the two marks were dissimilar).

Overall, the court finds that the similarity of the marks favors Defendants, particularly because JL Audio's name and/or logo is consistently displayed with its secondary mark of STEALTHBOX.

### b. Similarity of products

There are two different groups of products to consider. First, there is a broad group of products for which Plaintiff has registered the mark STEALTH, including sporting goods, specifically, tennis rackets, golf clubs, tennis balls, basketballs, baseballs, soccer-

balls, golf balls, crossbows, tennis racquet strings, and shuttlecocks in International Class 28; bicycles, motorcycles, and boats in International Class 12; pool cues, pool tables, darts, billiard balls, cue cases, cue racks, and billiard gloves, in International Class 28; microwave absorbing automobile paint, in International Class 2; comic books, in International Class 16; lawn sprinklers, in International Class 21; metal alloys for use in sporting goods and transportation and window locks, in International Class 6; fishing tackle floats, in International Class 28 (Ptf's Ex. B to Ptf's Motion for Judicial Notice); and, as of September 1, 1998, radar detectors in International Class 9. (Ptf's 12(N) Resp. ¶ 8.) Second, there are audio products for which Plaintiff has never received any trademark.[15]

"Because confusion is a factual matter, the plaintiff must produce proof; a theory about how consumers might be confused will not do, unless evidence supports the theory." *Reed–Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909, 912 (7th Cir.1996). Here, Plaintiff has proffered neither evidence nor a theory of why consumers might view its products (registered or unregistered) as similar to JL Audio's Stealthboxes. There are three levels of similarity: (1) competitive; (2) non-competitive but related; and (3) non-competitive and non-related. *Knaack Manufacturing Co. v. Rally Accessories, Inc.*, 955 F.Supp. 991, 1000 (N.D.Ill.1997). In answering this question, the court should consider how consumers view the products. *Id.* Looking to the first group of alleged products, i.e., the ones with registrations, there is no claim

13. There is one situation in which the conjunction of a challenged mark with a junior user's brand name is "an aggravation, not a justification": namely, where the senior user is alleging reverse confusion. *Sands, Taylor & Wood*, 978 F.2d at 960. As previously noted, it Plaintiff has neither stated a reverse confusion claim nor proffered evidence tending to show reverse confusion.

14. It is odd that Plaintiff made this claim, because, without proof of secondary meaning, a descriptive mark cannot be a valid trademark and cannot be infringed. *Union Carbide Corp. v. Ever–Ready Inc.*, 531 F.2d 366, 378 (7th Cir. 1976) ("A mark which is 'merely descriptive' may not be registered, and a holding that Car-

bide's mark [is] merely descriptive would defeat its action for infringement."); *id.* at 380 (noting that a descriptive mark which has attained secondary meaning as a source-identifying mark may be registered). Plaintiff has offered no evidence of secondary meaning, e.g., the "amount and manner of advertising, volume of sales, the length and manner of use, direct consumer testimony and consumer surveys." *id.* The court need not decide if "stealth" as applied to JL Audio's Stealthboxes is descriptive because Plaintiff has otherwise failed to show likelihood of confusion.

15. For purposes of the likelihood of confusion analysis only, the court will assume that Plaintiff had established trademark use.

that they are competitive with JL Audio's Stealthboxes, i.e., there is no claim that a person would substitute a Stealthbox for any of those goods. Additionally, only two of the products with registrations are even related to automobiles: the automobile paint and the radar detectors.[16] However, the simple claim that two products are somehow related to automobiles automatically places them in category (2) (non-competitive but related) has been soundly rejected. *Westward Coach Manufacturing Co. v. Ford Motor Co.*, 388 F.2d 627, 635 (7th Cir.1968) ("[W]hile the products of the automotive industry are necessary to provide mobility for the products of the trailer industry ... we cannot say that campers and trailers and sports cars are 'similar goods similarly marketed.'"); *Knaack Manufacturing*, 955 F.Supp. at 1000 (rejecting claim that labeling products as "motor vehicle accessories is sufficient to show a similarity of products"; finding that products are non-competitive and non-related where Plaintiff had "failed to produce any evidence that purchasers of these product types perceive a commonality."). *See also Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 967 (2d Cir.1981) (rejecting claim that crackers and chips with the same secondary mark were closely related based on the *nature of the products*, i.e., ingredients, uses, and method of preparation, on their different placement in a given supermarket, and on different marketing methods). In short, there is no reason to believe that a consumer would perceive a connection between STEALTH automobile paint or STEALTH radar detectors and JL Audio's Stealthboxes, all of which serve different purposes. Finally, the court rejects Plaintiff's claim that the court should find that a radar detector is similar to a stereo box or disclosure because both are classified in International Class 9. There is no evidence that a typical consumer has any knowledge of International Classifications or that any perception of similarity flows from that classification.

▮ Looking to the second group of products, the court finds that Plaintiff has failed to show that its goods are competitive with or related to JL Audio's Stereoboxes.

The only STEALTH audio products that there is any evidence of sales in the records are for 18 STEALTH car speaker or radio products: 10 "STEALTH SENTRA car speaker boxes" and 6 "STEALTH TERMINATOR car radios" ($20 apiece for $320.00 total with no provision for sales taxes or shipping and handling) in 1986 and 2 "STEALTH car radios" ($40 apiece for $80.00 total with no provision for sales taxes or shipping or handling) in 1987. Plaintiff's STEALTH audio products are standard, i.e., not custom. By contrast, the undisputed evidence regarding JL Audio's Stealthboxes are that they are custom-made, tailored to a given car's make, model, and year, and that their cost ranges from $500 to $2000. Again, Plaintiff's failure to produce *any* evidence tending to show that a consumer would consider these goods to be substitutable (i.e., competitive) or similar (i.e., related) dooms its claim to similarity of products. Plaintiff has also failed to offer any evidence that its products and JL Audio's Stealthboxes involve similar features or have similar functions.

The court finds that Plaintiff's products and JL Audio's Stealthboxes are non-competitive and non-related and, thus, finds that the similarity of products factor favors Defendants.

**c. Area and manner of concurrent use**

▮ Plaintiff has failed to show that there is any concurrent use. The concurrent use factor "focuses on the overlap of promotion, distribution, and sales of the parties' goods." *Imperial Toy Corp. v. Ty, Inc.*, 1998 WL 601875 (N.D.Ill.1998). Thus, case look to the geographical area of distribution, *Rust Environment & Infrastructure*, 131 F.3d at 1217, whether there is evidence of direct competition between the relevant products, *Smith Fiberglass Products, Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1330 (7th Cir.1993), whether the products are sold in the same stores, *Vitarroz*, 644 F.2d at 967, whether the products are sold in the same section of a given store, *id.*, whether the products are sold using the same means of advertising, *Victory Pipe Craftsmen, Inc. v. Faberge, Inc.*, 582

---

**16.** The court does not necessarily accept the relevance of the radar detector registration, which was not issued before the complaint was filed and was not in Plaintiff's control until after the cross-motions for summary judgment were filed.

F.Supp. 551, 558 (N.D.Ill.1984), and whether the products are sold through the same "marketing channels," e.g., retail stores or mail order. *Nike*, 6 F.3d at 1230. While there is no evidence regarding the geographical area of distribution of either Plaintiff's or JL Audio's products, the other elements all demonstrate little to no overlap. Plaintiff has offered no evidence of direct competition between the products, and, more specifically, has admitted that it knows of no situations in which its products have been sold in the same stores or promoted at the same trade shows as JL Audio's products. Additionally, there is no evidence that Plaintiff's audio products have been promoted directly to consumers, in contrast to JL Audio's products. There is no admissible evidence that Plaintiff's goods have ever been distributed through the same audio and stereo stores through which JL Audio's goods are sold. *See Knaack Manufacturing*, 955 F.Supp. at 1001 ("Knaack has failed to prove that even one of its distributors carried any Rally car covers.... The clear inference from this proof is that there is no overlap in distribution, which also minimizes any possibility of confusion."). Finally, it is undisputed that JL Audio's Stealthboxes, unlike Plaintiff's goods, are custom made and tailored for an individual's cars. Therefore, unlike Plaintiff's alleged car radios and speakers, which come standard, JL Audio's Stealthboxes must be custom ordered.

The court finds that there is no evidence of concurrent use.

### d. Degree of care

■ The degree of care factor seeks to distinguish how likely the relevant group of consumers is to distinguish between different products. Thus, "where consumers are sophisticated, deliberative buyers, confusion is less likely." *Rust Environment & Infrastructure*, 131 F.3d at 1217. By contrast, where the relevant group of consumers is likely to buy in haste or on impulse, confusion is more likely. *TV Land, L.P. v. Viacom International, Inc.*, 908 F.Supp. 543, 552 (N.D.Ill.1995). As a general rule, "where 'the cost of the defendant's trademarked product is high, the courts assume that purchasers are likely to be more discriminating than they might otherwise be.' Moreover, ... where the product involved was a low

value item, the risk of confusion is greater...." *Maxim's Limited v. Badonsky*, 772 F.2d 388, 393 (7th Cir.1985). Additionally, certain purchasing decisions, regardless of the price level, may be more deliberative. *See, e.g., Tsiolis v. Interscope Records, Inc.*, 946 F.Supp. 1344, 1356 (N.D.Ill.1996) (finding high degree of care despite low price level of CDs and cassettes because consumers "are 'necessarily discriminating' between different artists and different musical genres").

In this case, JL Audio's Stealthboxes cost between $500 and $2000. This is far beyond the price level considered "low." *See Nike*, 6 F.3d at 1230 ("In any event, we cannot agree that as a matter of law customers routinely purchase a $39.95 item without looking carefully at the product information."); *Knaack Manufacturing*, 955 F.Supp. at 1001 (finding that plaintiff had "failed to prove that consumers are not likely to exercise care in purchasing a $49 to $79 vehicle cover."). Additionally, the fact that JL Audio's Stealthboxes are custom made for different makes and models of automobiles tends to show that consumers have to consider product specifications before purchasing a Stealthbox. *See Knaack Manufacturing*, 955 F.Supp. at 1001 (finding that consumers had to consider product specifications in purchasing car covers which come in different sizes and which are designed for different weather conditions). Finally, Plaintiff has offered no evidence tending to show that consumers purchase car stereo equipment on impulse or otherwise without deliberation.

Thus, the court finds that the degree of care factor favors Defendant.

### e. Strength

■ "Strength" of a trademark measures the likelihood that a consumer will view a mark as source-identifying. *Id.* Strength cannot be proven merely by statements from a plaintiff's executives that its mark is famous. *Id.* at 1001–02. Additionally, the fact that a trademark has been registered does not create a presumption that the mark is strong or that the mark's coverage should be expanded to cover non-related products. *Id.* at 1002. Here, the only evidence that Plaintiff produces as to the strength of its "STEALTH" mark is its own president's

statements that the mark is famous. That is insufficient. Additionally, it is undisputed that several other producers have used or currently use the "STEALTH" mark for a wide variety of products—hence, Plaintiff is engaged in its multitudinous federal litigation. *See Westward Coach Manufacturing Co.*, 388 F.2d at 634–35 (finding that the "MUSTANG" mark was weak where several other producers had trademarked the mark for a variety of products). In the absence of proof, such as a consumer survey, showing strength of Plaintiff's STEALTH trademark, the court finds that the STEALTH mark is weak.

### f. Actual confusion

■ While proof of actual confusion is not required to prove likelihood of confusion, "courts often view evidence of actual confusion as the best evidence of likelihood of confusion." *Union Carbide*, 531 F.2d at 383. *But see Nike*, 6 F.3d at 1231 (noting that proof of actual confusion is not required to show likelihood of confusion but stating that " 'it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion' ") (quoting *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1136 (2d Cir. 1979)). However, "isolated instances of actual confusion or misdirected mail have been held insufficient to sustain a finding of likelihood of confusion." *Union Carbide*, 531 F.2d at 383. Courts have emphasized that "de minimis evidence of actual confusion does not necessarily establish a likelihood of consumer confusion." *Platinum Home Mortgage Corp.*, 149 F.3d at 729. *See also Forum Corp.*, 903 F.2d at 443 ("[D]e minimis evidence of confusion may be discounted."); *Henri's Food Products*, 717 F.2d at 358 (holding that survey showing a 7.6% rate of confusion weighs against a finding of likelihood of confusion).

Here, Plaintiff relies on vague allegations of unknown numbers of consumers who allegedly called or wrote to Plaintiff's related company STR complaining about JL Audio's Stealthboxes. However, Plaintiff has only C. Stoller's hearsay testimony as proof of these allegations—and such testimony is inadmissible. *Smith Fiberglass Products*, 7 F.3d at 1330–31 (holding district court ruling that actual confusion evidence which lacks "an exact quote or even the identity of the person making the statement" was hearsay; "Here, however, Smith presented no instances of actual confusion, but rather sought to admit into evidence a vague hearsay account of what may have been actual confusion ... Smith essentially asks this court to interpret *Forum Corp.* and *Helene Curtis Industries* as crafting a new hearsay exception to the Federal Rules of Evidence for paraphrases of state of mind declarations by unknown declarants. Without hesitation we refrain from adopting such a recommendation."). The court finds that Plaintiff has failed to establish actual confusion.

### g. Intent to palm-off

■ Plaintiff has offered no evidence tending to show that Defendants knew of Plaintiff's trademarks or of any possibility that Plaintiff's trademarks might apply to stereo boxes or enclosures and, therefore, has failed to demonstrate that Defendants had any intent to palm-off its goods as being those of Plaintiff.

### 3. Conclusion

The court has found that Plaintiff has no valid trademark covering audio products. Additionally, Plaintiff has failed to establish any of the seven factors comprising likelihood of confusion. The court GRANTS Defendants' motion for summary judgment as to Counts I, II, and III (trademark infringement under the Lanham Act) and DENIES Plaintiff's motion for summary judgment as to Counts I, II, and III.

### B. State law

■ Count IV is a state law claim pursuant to the Illinois Consumer Fraud and Deceptive Business Act and Uniform Deceptive Trade Practices Act of the State of Illinois. Both of these acts require the same showing of likelihood of confusion. *TV Land*, 908 F.Supp. at 553 (citing *AHP*, 1 F.3d at 619). Plaintiff has failed to make such a showing. Therefore, the court GRANTS Defendants' motion for summary judgment as Count IV and DENIES Plaintiff's motion for summary judgment as to Count IV.

### C. Sanctions

Defendants spend a great deal of time hinting that this court should award sanctions against Plaintiff. However, as no motion for sanctions has been filed, an award of sanctions would be inappropriate.

### V. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to all remaining counts and Plaintiff's motion for summary judgment is DENIED. Plaintiff's motion for judicial notice is GRANTED in part, DENIED in part, and MOOT in part. Defendants' motion to strike is MOOT.